## SOUTHERN PAC. CO. v. HARADA.

(Circuit Court of Appeals, Ninth Circuit. May 31, 1901.)

### No. 610.

RAILROADS—INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE.

Plaintiff, in the evening, started to walk across the tracks of defendant's railroad at a street crossing with which he was unfamiliar, and where there were two parallel tracks. Before starting across he looked in each direction, and saw the headlight of an engine on the track nearest him at such a distance that he could safely cross such track. He crossed it in safety, and had nearly reached the curb on the other side of the street when he was struck and injured by the train, which had passed onto a switch that curved sharply, and crossed to the other track on the opposite side of the street. There was testimony that no bell was rung, nor whistle blown. *Held* that, under the rule that it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of contributory negligence becomes one of law for the court, the question whether plaintiff was guilty of contributory negligence was properly submitted to the jury.

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of California.

Frank McGowan and Forshay Walker, for plaintiff in error.

Bert Schlesinger and Marshall B. Woodworth, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is an action to recover damages for injuries received by the defendant in error from the negligence of the plaintiff in error in running its train at a street crossing in Alameda, Cal. The jury before whom the case was tried found a verdict in favor of the defendant in error. There is testimony in the record to the effect that the railroad crossing at Everett street

and Railroad avenue was a hazardous and dangerous one; that the south track extended beyond Everett street, and finally ran into the north track; that it curved for the entire distance: that on account of the various switches, frogs, and the sharpness of the curved tracks, it was known to and designated by the conductor, engineer, and other employés of the railroad company as the "Horn," because it was "part of a circle"; that the instructions of the company to its employés were "to run carefully through that crossing"; that the defendant in error had never traveled on the broad gauge before; that he was not familiar with the crossing, and did not know of the habit or practice of the railroad company in switching its trains from the upper to the lower track, and was not aware of the existence of the numerous frogs and switches at said crossing; that there was no flagman at this crossing; that no whistle was blown or bell rung. Upon some of these points the testimony was undisputed, and upon others there was a conflict in the evidence. The testimony given by Harada will be hereafter referred to.

The controlling question presented by the assignments of error is whether or not the defendant in error is shown by the evidence to have been so clearly guilty of contributory negligence as to authorize this court to say, as a matter of law, that the trial court should have instructed the jury to return a verdict in favor of the plaintiff in error. The rule is well settled that, when an appellate court is asked to set aside the verdict of a jury in a common-law action upon the facts, all conflict in the evidence must be resolved in favor of the party in whose favor the verdict was rendered. In other words, if, by giving credit to the plaintiff's evidence, and discrediting that of the defendant, the plaintiff's case is made out, the verdict should stand. Railroad Co. v. Teeter, 11 C. C. A. 332, 63 Fed. 527; Railway Co. v. Sharp, 11 C. C. A. 337, 63 Fed. 532, 534, and authorities there cited. The facts in this case are essentially different from the facts in Railroad Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542, Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068, and Railroad Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014, upon which appellant chiefly relies. In those cases it affirmatively appeared that the person injured went upon the railroad track without stopping, looking, or listening, to see whether a train was coming in either direction. In Elliott v. Railway Co., Elliott started to cross the track when the train was not more than 20 feet distant from him, without looking to see whether any train was coming. The court, in passing upon the question of contributory negligence, said:

"This is not a case in which one placed in a position of danger through the negligence of the company, confused by his surroundings, makes, perhaps, a mistake in choice as to the way of escape, and is caught in an accident. For here the deceased was in no danger. He was standing in a place of safety on the south of the main track. He went into a place of danger from a place of safety, and went in without taking the ordinary precautions imperatively required of all who place themselves in a similar position of danger. The trial court was right in holding that he was guilty of contributory negligence."

The other cases were substantially the same.

In the present case Harada testified, among other things, as follows:

"My age is 18 years. I live in Alameda, and have been a resident of Alameda for about three years. By occupation I am a self-supporting student. * * * On the evening of the 4th of October, 1898, I was at Mrs. Phillip's house, at the corner of Lafayette and Encinal avenue. I left her house a little bit before half past 7 p. m., and went to Willow station, where I took the train, went into the first coach, and sat in the first seat. This was the broad-gauge road. Mr. Sato was in the seat with me. I alighted at Park street station. We arrived there about ten minutes to 8 o'clock. In alighting from the car I went from the first door and from the right-hand step. I alighted at about Foley street, and got down from the right-hand step of the coach and walked up along Railroad avenue, parallel to the track, with my friend Sato. I arrived at the southeast corner of Everett and Railroad avenue, and just where the electric pole stands. I stopped there and looked at both sides and listened. To the right I saw darkness. To the left I saw the headlight of an engine. I could not exactly judge where the engine was standing, the headlight of which I saw. I thought it was a little beyond the water tank. I heard the same sound that the engine was making when I alighted from the coach at the station. I heard no sign of the approaching train,—no bell was ringing, no whistle,—so I thought myself safe, and I started to cross from the southeast corner to the northeast corner of Everett and Railroad avenue. Just when I crossed the second rail of the upper track I heard some puffing of an engine, and the rumbling sound of an approaching train. I looked in the direction, and I saw a train was coming. In the darkness I could not exactly locate the position, but I thought it was about opposite the water tank, or a little nearer to me; that is to say, between the water tank and Everett street, on the upper or right-hand track. I thought the coming train was on the upper track, because I knew I left the train at the station on the upper track. As I arrived at the station I saw another train stationary on the lower track at the station. That led me to think that this coming train was not on the left-hand track. I saw a train stationary on the lower track. The engine was pointed in the direction of the mole toward the west; that is to say, when I alighted at the Park street station. I left the train from which I alighted on the upper track, so I thought the coming train—that is, the one that was coming in my direction—was on the upper track. Therefore I thought myself safe, because I had just crossed the upper track. I kept on crossing, and crossed the last rail of the lower track, and was one foot on the cement sidewalk, when no bell was ringing, no whistle blown, but the rumbling sound of the coming train made me look in this direction whence it came, when I saw the engine was upon me, and so near that I had no time to escape, and I was struck. My foot was on the pavement of the sidewalk. When I was struck I had crossed the last rail of the lower track, and one foot was on the pavement of the sidewalk. The other foot was on the ground between the rail and the sidewalk."

This case presents the question whether Harada had the right to act upon the conditions, situations, and surroundings as they appeared to him. He had done all that was required of him to be done before he entered upon the railroad track. He had stopped, looked in both directions, and listened. It is true that Harada had actual notice of the approach of the train on the south or upper track, and if he had been injured while attempting to cross that track, owing to any miscalculation he had made as to the time it would take for the train to come, or the distance it would have to travel, the case would then come within the rule of the cases above referred to; for, so far as that track was concerned, there was no warning which the railroad company could give that would have been any more effective than the knowledge Harada had of the approach of the train on that track. But the injury did not occur on that track. Harada had not made any mistake as to his being able to cross that track in safety. He did safely cross it. But when the railroad company switched its

train of cars from the south or upper track to the north or lower track, upon which the injuries were received, without giving any additional warning, it presents an entirely different question, and must be considered and governed by other and different rules. We must take the facts as we find them, and apply the law to such facts. Was Harada guilty of contributory negligence after he had safely crossed the track upon which he saw the train moving, and upon which he supposed it would continue to come? The court, in its charge to the jury, with reference to this question, said:

"I submit for your consideration whether this crossing was not extra-dangerous, by reason of what amounts practically to three tracks at that point, and by reason of the practice of switching trains from one track to the other, so that, while what are known as the north and the south tracks pass diagonally through the street crossing, the third track over which trains pass runs at such an angle that one of two men crossing Railroad avenue at Everett street, side by side, may be struck, while the other is not. And in this connection you are to consider whether the plaintiff, if he was passing along Everett street across Railroad avenue, as he testifies, and seeing cars upon the north track headed in the direction away from him, would not be justified in assuming that he was in no danger from cars upon that track. Assuming that he heard and knew there was a train coming in his direction, you may consider whether he might not reasonably suppose that such train would pass along the south track, over which he could safely pass before a train could reach that point. Did he know or have reason to think that the approaching train would cut across at this point from the south to the north track, and that he might be struck at the edge of the opposite sidewalk?"

We think this charge was correct, in view of all the existing conditions at the crossing where the accident occurred. In addition to this, the record shows that the court and jury visited the place, and viewed the premises, where the accident occurred, and were furnished with the additional light of actual observation, which enabled them to virtually put themselves in Harada's place, and from that standpoint to determine whether or not he exercised due care and caution, and acted as a reasonable, careful, and prudent man would under such circumstances and conditions. The supreme court of the United States, in determining whether or not the party injured was guilty of contributory negligence, or had exercised ordinary and reasonable care and diligence, has frequently recognized and enforced the principle that persons passing over railroad tracks at a public crossing have a right to act upon the existing conditions and surroundings at that particular place. There cannot be any fixed standard by which courts are enabled to say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. In Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485, where, within the limits of the city, the street was crossed obliquely at a grade by the defendant's railroad and two other parallel roads coming up from the southwest, which roads curve away from a person coming down the Holden road, it appeared that on the morning of the accident Mr. Smith and his wife were driving down the Holden road in a buggy, with the top raised, and with the side curtains either raised or removed. Opposite the Lawrence house they stopped several minutes, presumably to listen for any trains that might be passing, and while there a train on one of the other roads passed by, going out of the

city. Soon after it had crossed the road, and while the noise caused by it was still quite distinct, they drove on towards their destination. Just as they reached the defendant's track, and while apparently watching the train that had passed, they were struck by one of the defendant's trains coming from the right at the rate of at least 20 miles an hour, and were instantly killed. The court, in reviewing certain instructions asked in that case, said:

"What may be deemed ordinary care in one case may under different surroundings and circumstances be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

Numerous cases are cited by the court in support of its decision upon this point. See, also, Solen v. Railroad Co., 13 Nev. 106, 128, 144; Railway Co. v. Netolicky, 14 C. C. A. 615, 67 Fed. 665, 669, 671; Railroad Co. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748, 37 L. Ed. 642; Gardner v. Railroad Co., 150 U. S. 349, 361, 14 Sup. Ct. 140, 37 L. Ed. 1110; Railroad Co. v. Moore, 45 C. C. A. 21, 105 Fed. 725, 727; Beach, Contrib. Neg. (2d Ed.) §§ 449, 450, 454, and authorities there cited. If inferences other than that of contributory negligence may be fairly drawn from all the evidence and facts shown to exist, then the question is one of fact for the jury to decide. Railway Co. v. Lowell, 151 U. S. 209, 14 Sup. Ct. 281, 38 L. Ed. 131; Railway Co. v. Sharp, supra. In Beach, Contrib. Neg. § 450, the author said:

"In general, it cannot be doubted that the question of contributory negligence is a question of fact, and not of law. Whenever there is any doubt as to the facts, it is the province of the jury to determine the question; or, whenever there may reasonably be a difference of opinion as to the inferences and conclusions from the facts, it is likewise a question for the jury. It belongs to the jury not only to weigh the evidence and to find upon the questions of fact, but to draw conclusions as well, alike from disputed and undisputed facts."

The defendant in error, notwithstanding the negligence of the plaintiff in error, was bound to exercise ordinary and reasonable care to avoid injury. Did he do so? In considering this question, it must be borne in mind that the same measure of justice, the same rule of conduct, and the same general principles of law apply to the plaintiff as well as to the defendant. The people have the same right to travel on the ordinary public crossings over railroad tracks as the railroad companies have to run their trains thereon. Although railroad companies have the right of way and of precedence at the crossings, they must be held to be on equal terms with persons having the right to cross their tracks. It is the duty of each to exercise the same care and diligence. The right of precedence in favor of the railroad companies does not impose upon the traveler the sole duty of avoiding any collision. He has the right to assume when he sees a train com-

ing that the railroad company will exercise ordinary and reasonable care, and give due and timely warning of its approach, especially where it switches off upon another track from which it is seen moving, or increases its rate of speed as it nears the crossing. Railroad Co. v. Griffith, 159 U. S. 603, 609, 16 Sup. Ct. 105, 40 L. Ed. 274. In the light of all the facts contained in the record, and of the principles of law announced in the decisions to which we have referred, we are irresistibly brought to the conclusion that reasonable, fair-minded, impartial men might honestly differ upon the question whether or not the defendant in error was guilty of contributory negligence. It therefore necessarily follows that the circuit court did not err in submitting the case to the jury. We have examined all the other questions presented by the record herein, and find no prejudicial error. The judgment of the circuit court is affirmed, with costs.

ROSS, Circuit Judge (dissenting). This was an action for damages for a serious injury sustained by a Japanese boy of about 18 years of age, named Jiro Harada, about 8 o'clock in the evening of October 4, 1898, at the crossing of Everett street and Railroad avenue in the city of Alameda. At this point are two tracks of the plaintiff in error running about east and west along Railroad avenue,—one called in the record the "North Track," and the other the "South Track." There is also at the intersection of the streets mentioned a railroad switch connecting the two tracks, and a number of frogs. At the intersection of the streets there is also a decided curve in the tracks. At the southeast corner of these streets is an electric light pole, to which there is attached an arm extending over the track, from which there was suspended an electric lamp, but whether or not it was lighted at the time of the accident is a matter of dispute in the evidence. About 245 feet from the crossing is a water tank, along which is a short side track, on which a train was standing. Still further from the crossing and about 300 feet from the water tank was Park street station, at which Harada had alighted very shortly before his injury. At the water tank the train also stopped to let off a passenger. The switch referred to is between the tank and the Everett street crossing. When Harada was struck and injured by the train, he was crossing from the southeast to the northeast corner of Everett street and Railroad avenue, and in doing so had to, and did, cross both the north and south tracks of the company. He was struck just as he was leaving the north track; the train having, at the intersection of the streets, switched from the south to the north track. It is insisted on behalf of the defendant in error that the crossing in question was an extrahazardous one, and the complaint in the case alleges that it could only have been made safe by the railroad company stationing a flagman there to give warning to persons approaching or passing thereon, or by erecting gates or other obstructions along Everett street. It is further alleged in the complaint that the railroad company did not station any flagman at the crossing, nor erect any gate or other obstruction along Everett street, and that on the occasion of this injury there was no bell rung, nor whistle blown, nor other warning given of the approach of the train. The

answer of the defendant admits that there was no flagman stationed at the crossing, and no gates or other obstructions erected across Everett street, and admits that on the occasion in question no whistle was sounded, but alleges that the bell on the engine was rung for a distance of 80 rods before reaching the crossing, and kept ringing continuously while crossing Everett street, and further alleges that it was not practicable for the defendant company to have maintained gates or other obstructions at the crossing in question, and that under the laws of the state of California the defendant was not required to sound a whistle at this crossing, but only to ring its bell, which it did. The answer further sets up contributory negligence on the part of the injured party. In respect to the alleged negligence of the defendant company the evidence given upon the trial was conflicting, and therefore, in view of the verdict, which was for the plaintiff, it must be assumed that the alleged negligence of the defendant was established. The real, and, indeed, the only, question in the case is whether or not the alleged contributory negligence of Harada is so conclusively shown as to require a reversal of the judgment. The question of the failure of the railroad company to post a flagman to give warning of the approach of its trains, or to erect gates or other obstructions along Everett street for a similar purpose, so much commented upon by counsel for the defendant in error, has no bearing on the real question for determination. Those questions, as well as the failure of the company to ring the bell or blow the whistle, go only to the alleged negligence of the railroad company, which, as has been said, must be assumed to have been established. It is unquestionably thoroughly established that ordinarily both negligence on the part of a defendant and contributory negligence on the part of a plaintiff are questions of fact to be passed upon by a jury. This has been held in cases almost without number. A late one in this court was Thompson v. Railroad Co., 35 C. C. A. 357, 93 Fed. 384. But the rule is quite as well settled that, where the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict returned in opposition to it, it should withdraw the case from the consideration of the jury and direct a verdict. Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068; Railroad Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014. The evidence of Harada himself shows him to be a bright young man, and it is not claimed that either his sight or hearing was in any way impaired. His account of the accident is given in this extract from his testimony: •

"My age is 18 years. I live in Alameda, and have been a resident of Alameda for about three years. By occupation I am a self-supporting student. In the month of October, 1898, I was a self-supporting student. At that time I was living in Alameda, on the corner of Lafayette and Encinal avenue. On the evening of the 4th of October, 1898, I was at Mrs. Phillip's house, at the corner of Lafayette and Encinal avenue. I left her house a little bit before half past 7 p. m., and went to Willow station, where I took the train, went into the first coach, and sat in the first seat. This was the broad-gauge road. Mr. Sato was in the seat with me. I alighted at Park street station. We arrived there at about ten minutes to 8 o'clock. In alighting from the car I went from the first door, and from the right-hand step. I alighted at about Foley street, and got down from the right-hand step of the

coach and walked up along Railroad avenue, parallel to the track, with my friend Sato. I arrived at the southeast corner of Everett and Railroad avenue, and just where the electric pole stands. I stopped there and looked at both sides and listened. To the right I saw darkness. To the left I saw the headlight of an engine. I could not exactly judge where the engine was standing, the headlight of which I saw. I thought it was a little beyond the water tank. I heard the same sound that the engine was making when I alighted from the coach at the station. I heard no sign of the approaching train; no bell was ringing; no whistle; so I thought myself safe, and I started to cross from the southeast corner to the northeast corner of Everett and Railroad avenue. Just when I crossed the second rail of the upper track I heard some puffing of an engine, and the rumbling sound of an approaching train. I looked in the direction, and I saw a train was coming. In the darkness I could not exactly locate the position, but I thought it was about opposite the water tank, or a little nearer to me; that is to say, between the water tank and Everett street, on the upper or right-hand track. I thought the coming train was on the upper track, because I knew I left the train at the station on the upper track. As I arrived at the station I saw another train stationary on the lower track at the station. That led me to think that this coming train was not on the left-hand track. I saw a train stationary on the lower track. The engine was pointed in the direction of the mole toward the west; that is to say, when I alighted at the Park street station. I left the train from which I alighted on the upper track, so I thought the coming train—that is, the one that was coming in my direction—was on the upper track. Therefore I thought myself safe, because I had just crossed the upper track. I kept on crossing, and crossed the last rail of the lower track, and was one foot on the cement sidewalk, when no bell was ringing, no whistle blown, but the rumbling sound of the coming train made me look in this direction whence it came, when I saw the engine was upon me, and so near that I had no time to escape, and I was struck. My foot was on the pavement of the sidewalk. When I was struck I had crossed the last rail of the lower track, and one foot was on the pavement of the sidewalk. The other foot was on the ground between the rail and the sidewalk."

On cross-examination he testified, among other things, as follows:

"Q. Did you notice whether or not the first track you crossed was covered with mud and dirt? A. I think it was not. It was plain to me. It was medium dark. I know what is considered there as the south track. That is the lower track, as I refer to it,—the first one that I crossed. I did not notice that this track was covered with mud and dirt. I saw it when I crossed it. I saw the rails. When we went out of the cars at Park street station a few people went ahead of us, and I walked with Mr. Sato. Mr. Sato walked with me up to the point of accident, and he was with me at the time I crossed the track at the point of accident, and at the time the accident occurred. He was on my left-hand side, and he was on that side when we attempted to cross the track. He was also on that side when we were at the electric light pole. I think Sato and I were almost abreast when we were making the crossing. He may have been an inch or two ahead of me, but I think we were abreast. He was between me and the locomotive, and we were walking almost abreast. When I got to the electric light pole I stopped a moment to look at both sides. I think Sato stopped. I have a slight recollection that he did. At this point when I looked west along the track I saw the headlight of the engine. The engine was a little beyond the water tank. It was about three hundred feet from me west,—beyond the water tank. It was then that I proceeded to cross the track, thinking myself safe. I next observed this locomotive when I was just over the second rail of the upper track on the southerly track. I was just over the north rail of the southerly track when I saw the locomotive. The locomotive then, when I was in that position, was about opposite the water tank, or a little nearer to me; that is to say, between me and the water tank. It being in the darkness, I could not locate exactly the position it was in, but it appeared to me to be about the water tank. When the locomotive was at that

point,—the water tank,—I could see the headlight plainly on the locomotive. The water tank referred to is about two hundred feet from the point where I met with the accident. When I was at this point, just over the north rail of the south track, I could hear the rumbling sound of the moving train. Q. In which direction was the train moving? A. Towards me. Q. Towards you? A. Yes, sir; in a northeasterly direction. (Witness continuing:) I think I traveled about thirty feet from the point where I was when I saw the locomotive at the tank until I reached the point of accident. I am not sure that the distance is thirty feet. I traveled from the north rail of the south track to the point of accident on the concrete sidewalk. I traveled in rather a brisk walk. Q. Did you know that the locomotive was coming? A. Yes, sir. Q. Is that the reason that you traveled so briskly? A. In the same speed that I continued to travel. Q. Can you explain to the jury how that locomotive caught you, coming a distance of two hundred and forty-five feet, while you were traveling thirty feet at a brisk walk? Can·you give any explanation of it, Mr. Harada? A. No, sir; I may have been mistaken about locating the engine, or how it happened. Q. After you crossed the north rail of the lower track and saw the locomotive at the tank, did you look for the locomotive again? A. May I ask for your question? There is a contradiction between your question and my answer. I always call it the 'upper track,' and you call it the 'lower track.' Is it the southerly track? Mr. McGowan: The southerly track. Mr. Schlesinger: Designate by upper and lower. He is more familiar with these terms. Mr. McGowan: No; designate by north and south track. Mr. McGowan: What did you do after you crossed the north rail of the south track? A. I kept on crossing. Q. Did you look for the locomotive after that? A. No, sir; I did not. Q. You knew it was coming, didn't you? A. Yes, sir. Q. You heard the sound? A. Yes, sir. Q. You saw the light of the locomotive? A. Yes, sir. Q. Why did you not look? A. For this reason, Mr. Counselor: I knew that I had left the train at the Park station on the southerly track, so I thought it was not coming on the north track; and, secondly, I saw another train stationary at the Park station on the north track. That made me also think that this coming train was not on the north track, and as the bell did not ring,, or any warning was given me, it made me think I was not in danger. Q. You knew it was coming in that direction? A. Yes, sir. Q. And after you crossed this north rail of the south track you never looked to see whether it was coming or not? A. No, sir; for these reasons. Q. Did you pay any attention to any noise being made?· A. I heard a noise; yes. Q. Did you not know that the train was coming in your direction? A. I knew that train was coming on the southerly track, which I had safely crossed. Q. You had never been there before? A. No, sir; but that is the way I thought it was. Q. You 'thought'! You never had seen them operating on this track? A. No, sir; not at that point. Q. What did the company ever hold out to you to induce you to believe that they operated on that track? Anything? A. No, sir. Q. What made you 'think,' then? A. For these reasons: I knew I left that train at the Park station on the south track. (Witness continuing:) At the time I was making this crossing I am positive that I was not talking to my friend Sato. The house where the Japanese lived is something over sixty feet from where I met with the accident, and I was going to that house. Q. Are you quite sure that you paid no further attention to the train? A. No, sir; until a moment before I was struck. Q. So that from the time you left the north rail of the south track you relaxed your vigilance? A. I thought myself so safe, and walked at the same speed. Q. You relaxed your vigilance, did you not? A. Not necessarily. Q. After you crossed the north rail of the south track you did not look in the direction of the coming locomotive? A. No, sir; not until a moment before I was struck. Q. Nor did you listen to determine whether or not the locomotive was coming in the direction where you were traveling? A. As I testified before, the thing that made me look in that direction was the sound of the train. Q. Did you look in that direction after that time? A. As I said, just a moment before I was struck. Q. But from the time that you crossed the north rail of the south track until the time that you were struck, or immediately before it, did you look at the coming locomotive? A.

No, sir. Q. What direction did you turn your head? A. To the place where I was going. Q. You went right ahead? A. Yes, sir. Q. From the time you crossed the north rail of the south track until you were struck by the locomotive, did you listen to determine whether or not the locomotive was coming in your direction? A. As I said, it was the noise. I heard the noise. The Court: He said he heard it. Mr. McGowan: You heard it coming? A. Yes, sir. Q. Why did you not hasten your speed and get out of the way? A. As I said before, this coming train I thought was on the south track, which I had safely crossed, and therefore thought myself safe. Q. Did you see the railroad track there? A. Yes, sir. Q. Was that any indication to your mind? A. Nothing more than those were for use by the trains. Q. Was it any indication of danger to you? A. Naturally; yes. Q. It indicated danger to you at that time? A. Yes. Q. About what time elapsed from the time that you saw the locomotive at the tank until you were struck? A. I cannot tell about that. I don't know that it was more than a minute. I cannot tell what length of time the train was coming from the tank to where I was struck. I have no idea. Q. Was the locomotive moving when it was opposite the tank? A. As I conceived it; yes. Q. It was moving? A. Yes, sir; that is what I thought. Q. When you heard the puffing of the locomotive, what did it indicate to you? A. A coming train. Q. It indicated that the train was approaching, did it not? A. Yes, sir. Q. When you saw the locomotive approaching the water tank, why did you not look again when you went across the second track? A. Because I thought myself safe when I crossed that south track, on which I thought the train was coming. Q. Is that the only reason? A. Yes, sir. Q. You were examined as a witness on the former trial, and I now call your attention to page 56 of that testimony. You were then asked: 'When you saw the locomotive approaching at the water tank, why did you not look again when you went across the second track. A. I went briskly ahead.' Q. Why did you not look again? A. I did not spend time to look.' Did you so testify? A. I think I did; yes."

On redirect examination Harada further testified:

"Q. Why did you attempt to cross after you had safely crossed the southerly or upper track? A. Because I never thought that the coming train was not on the north track. Therefore I thought myself safe, so I went on. Q. Were you familiar with the practice of the company in switching its 7:30 train from the upper to the lower track? A. No, sir. Q. When you were crossing Everett street, did you take any measurements as you went along? A. I took nothing; no, sir. Q. You did not measure the distance between you and the locomotive? A. No, sir. Q. Nor did you count the number of switches in the crossing? A. No, sir. Q. Did you know that there were any switches in the crossing? A. No, sir; I did not. Q. You did not know that the company was using a public highway—the middle of a street crossing— for switching purposes, did you? A. No, sir."

It is admitted by counsel for defendant in error that the witness Sato, who was with Harada at the time, corroborated him in all respects, and there is nothing in the evidence conflicting with his testimony as to what he saw, heard, and did at the time of the accident. It appears from the evidence, without conflict, that from the electric light pole at the southeast corner of Everett street and Railroad avenue to the north rail of the south track is 32 feet, and from that point to the sidewalk about 15 feet. From the testimony of the plaintiff himself it clearly appears that when he was at the electric pole at the southeast corner of the intersection of the two streets, he stopped, listened, and looked, and then saw the headlight of the locomotive at the water tank, about 245 feet away, and that he then started across the street, without looking either way or paying any further attention to the train, until he reached the north rail of the

south track, at which time he saw that the train was approaching him; that he then saw the headlight, and heard the puffing of the locomotive and the rumbling sound made by the train, but he did not accelerate his speed, nor again look in the direction of the approaching train. In other words, he relaxed all vigilance and abandoned the usual and ordinary precautions exercised by any and every reasonable man under like circumstances. His explanation is that he thought the train was approaching on the south track, which he·had already crossed. In that calculation he was mistaken. But surely the law cast upon him the duty of continuing his vigilance during the crossing of both tracks. His failure to do so was not only the grossest ˙sort of carelessness, but was almost madness. This case presents a far stronger one of contributory negligence on the part of the injured party than that of Railroad Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014, in which the supreme court held that the plaintiff could not recover, because of his contributory negligence, notwithstanding negligence on the part of the defendant. In that case one Thomas A. Freeman, whose eyesight and hearing appeared to be perfectly good, in traveling a highway undertook to drive across the railroad track in a light wagon drawn by two horses. The evidence, as stated by the court, was practically uncontradicted that for a distance of 40 feet from the railway track he could have seen the train approaching at a distance of about 300 feet. The train was a freight train going at a speed not exceeding 20 miles an hour. The court said: ·

"Judging from the common experience of men, there can be but one plausible solution of the problem how the collision occurred. He did not look, or, if he looked, he did not heed the warning,' and took the chance of crossing the track before the train could reach him. In either case he was' clearly guilty of contributory negligence."

In that case, as in this, the evidence was conflicting in respect to any warning of the approach of the train having been given by those in charge of it. But here, assuming, as we have done, that the company did fail to give any warning of the approach of the train that did the injury, the party injured had actual notice of its approach in ample time to have kept out or have gotten out of its way; for he expressly states in his testimony that he saw the headlight and saw and heard the train approaching him, but that he thought it was on the south instead of the north track. No warning that the railroad company could have given would have been any more notice to him than he already had by means of his eyes and ears, according to his own statement. In the case of Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, so much relied upon by counsel for the defendant in error, the facts are given by the court as follows:

"Elijah Smith, plaintiff's intestate, at the time of his death in May, 1884, was about seventy-five years of age, and had been residing on a farm, a few miles out of the city of Detroit, for several years, being engaged in grape culture. It was his custom to make ·one or more trips to the city every day during that period. In going to the city he traveled eastwardly on a much-traveled road, known as the 'Holden Road,' which, continued into the city, becomes an important and well-known street, ·running east and west. Within the limits of the city the street was crossed obliquely at a grade by the defendant's road and two other parallel roads coming up from

the southwest, which roads, in the language of the defendant's engineer, curve 'away from a person coming down the Holden road.' At the crossing the Holden road is sixty-five and one-half feet wide. The defendant's right of way is forty feet wide, and the right of way of all the parallel railways at that place is one hundred and sixty feet wide. For a considerable distance—at least three hundred feet—along the right side of the road going into the city there were obstructions to a view of the railroad, consisting of a house known as the 'McLaughlin House,' a barn and its attendant outbuildings, an orchard in full bloom, and, about seventy-six feet from the defendant's track, another house, known as the 'Lawrence House.' Then there were some scrub bushes, or, as described by one witness, some stunted locust trees and a willow, a short distance from the line of the right of way. So that it seems, from all the evidence introduced on this point, it was not until a traveler was within fifteen or twenty feet of the track, and then going up the grade, that he could get an unobstructed view of the track to the right. One witness testified that, if he was in a buggy, his horse would be within eight feet of the track before he could get a good view of it in both directions. On the morning of the fatal accident, Mr. Smith and his wife were driving down the Holden road into Detroit, in a buggy with the top raised, and with the side curtains either raised or removed. Opposite the Lawrence house they stopped several minutes, presumably to listen for any trains that might be passing, and while there a train on one of the other roads passed by, going out of the city. Soon after it had crossed the road, and while the noise caused by it was still quite distinct, they drove on towards their destination. Just as they had reached the defendant's track, and while apparently watching the train that had passed, they were struck by one of the defendant's trains coming from the right at the rate of at least twenty—some of the witnesses say forty—miles an hour, and were thrown into the air, carried some distance, and instantly killed. This train was a transfer train between two junctions, and was not running on any schedule time. The plaintiff's witnesses agree, substantially, in saying that the whistle was not blown for this crossing, nor was the bell rung, and that no signal whatever of the approach of the train was given until it was about to strike the buggy in which Mr. Smith and his wife were riding. The train ran on some four hundred feet or more after striking Mr. Smith before it could be stopped."

Railway Co. v. Ives is one of the many cases referred to by the supreme court in Railroad Co. v. Freeman, supra, as being readily distinguishable from that case, and, I may add, with still more reason, from the present one, "either by reason of the proximity of obstructions interfering with the view of approaching trains, confusion caused by trains approaching simultaneously from opposite directions, or other peculiar circumstances tending to mislead the injured party as to the existence of danger in crossing the track." In my opinion, the judgment should be reversed, and the cause remanded to the court below for a new trial.